UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| DONNA J. SHEEDY, | ) | |
|---|---|---|
| Plaintiff, | ) | Judge Joan B. Gottschall |
| v. | ) | Case No. 12 C 3979 |
| ADVENTIST HINSDALE HOSPITAL, an Illinois Corporation, | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION & ORDER**

Plaintiff Donna J. Sheedy has brought a one-count complaint alleging a violation of the Age Discrimination in Employment Act ("ADEA"), against defendant Adventist Hinsdale Hospital ("the Hospital"), based on the Hospital's termination of her employment as a Registered Nurse. Now before the court is the Hospital's motion for summary judgment on Sheedy's ADEA claim. Because the court concludes that Sheedy has not demonstrated a genuine question of material fact as to whether she was terminated because of her age, the court grants the motion.

### I. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). "[A] factual dispute is 'genuine' only if a reasonable jury could find for either party." *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). The court ruling on the motion construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is warranted when the

nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

A brief discussion of the rules governing summary judgment motions is warranted here. In addition to complying with the Federal Rules of Civil Procedure, the parties must also adhere to the Local Rules for the Northern District of Illinois and this court's Standing Order. Local Rule 56.1 provides that the moving party shall serve and file:

> 1) any affidavits and other materials referred to in Fed. R. Civ. P. 56(e);
>
> 2) a supporting memorandum of law; and
>
> 3) a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law
>    . . . .
>
> The statement referred to in (3) shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph.

L.R. 56.1(a). All argument must be contained in the party's brief, not in the Rule 56.1 statement. Standing Order at 1-2.

The party opposing summary judgment is required to respond with its own supporting evidence, memorandum, and "concise response to the movant's statement . . . ." L.R. 56.1(b). The opposing party's Rule 56.1(b) statement should also contain "any additional facts that require the denial of summary judgment." *Id*. The opponent must include references to its supporting materials. *Id*. Failure to respond to a statement results in the court admitting the statement as true. *See Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006).

## II. FACTS

The court takes the following facts from the parties' Local Rule 56.1 Statements of Facts ("SOFs"), to the extent that they are supported by admissible evidence and relevant to issues

raised in the motion. The court has omitted from this summary certain facts that have been relied upon by neither party in its memorandum.[1] Where facts are disputed, the court takes no position as to which version of the disputed matter is correct. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

Sheedy, who was born on February 24, 1946, was employed at the Hospital as a Registered Nurse from December 10, 1979, until her termination on June 30, 2011. At the time of the events alleged in the complaint, Lisa Pittman was the Nurse Manager of the medical oncology unit where Sheedy worked (known as "Unit 2 North" or the "2 Medical unit") and was Sheedy's direct supervisor. Pittman was hired in March 2011. Pittman reported directly to Lynn Wagner, the Hospital's Nurse Director for the Medical, Surgical, and Critical Care Departments.

**A. Hospital Policies**

The Hospital maintains an Employee Handbook. Sheedy acknowledged receiving the most recent version of the Handbook on September 20, 2008. The Handbook states that employees are expected to practice outstanding customer service: "You are expected to be courteous, friendly and helpful at all times . . . . Behaviors involving harassment, offensive speech or inappropriate conduct are prohibited. . . ." (Def.'s SOF Ex. A-18 (Handbook) 9, ECF No. 24-1.) It includes a Code of Conduct, which states:

> Although cause is not required for termination, violation of any of this facility's policies, rules and procedures will result in disciplinary action, up to and including termination at the discretion of this facility. This facility will take into consideration all of the circumstances involved, as well as your overall work record, when deciding what action should be imposed for violation of facility policies, rules and procedures.

---

[1] For example, Defendant's SOFs ¶¶ 62-67 pertain to a document described as Gallup Survey results for a Hospital unit different from the unit in which Sheedy worked. Sheedy admits that she does not know who prepared the document or who made the comments recorded in the document, and she does not rely on the document in her response to the motion for summary judgment. The court therefore omits the document from its summary of the facts.

(*Id.* at 29.) The Code of Conduct lists as violations "Misconduct or physical/verbal abuse toward facility patients, customers, visitors or employees" and "Failure to comply with the expectations for customer service excellence (SHARE)." (*Id.* at 31.)

The Hospital's customer service program, called "SHARE," sets out standards of behavior relating to customer service. On March 24, 2010, Sheedy signed a copy of the SHARE standards and agreed to abide by them. The SHARE standards provide, in part:

> Provide exceptional care and to exceed the expectations of customers, patients and co-workers . . . Extend a friendly greeting to everyone, every time . . . Take ownership and be responsible for the outcomes influencing the experience of each customer by paying attention to personal details . . . do not gossip or talk negatively about others . . . Convey understanding and sensitivity to our patients and co-workers . . . Respect our clients' right to privacy and dignity by creating and maintaining a secure environment during each communication and public interaction . . . us[e] a courteous tone of voice and body language.

(Def.'s SOF Ex. A-21 (SHARE Standards of Behavior), ECF No. 24-1.) Hospital patients were able to use SHARE cards to provide feedback to the Hospital, including praise and complaints about their care.

Sheedy was familiar with the Hospital's Discipline Policy. It provides that termination will generally result if an employee has received multiple disciplinary actions that have failed to correct unacceptable behavior, and states that the corrective action process can begin at any point, depending on the severity of the infraction.

**B. Sheedy's Performance Issues and Discipline**

On March 25, 2011, Sheedy received an annual evaluation for the year 2010, completed in February 2011 by her then-supervisor, Thelma Hulka. The evaluation rated Sheedy between "successful" and "outstanding" on the Hospital's scale of performance with respect to the SHARE standards. Sheedy received a raise following the evaluation.

4

Pittman became Sheedy's supervisor in March 2011. When Pittman was hired as Nurse Manager, Unit 2 North's patient satisfaction scores were lower than the 10th percentile as compared to other medical oncology units. Pittman testified at deposition that her job was to raise the unit's patient and staff satisfaction ratings. (Def.'s SOF Ex. B (Pittman Dep.) 30:21-31:1, ECF No. 24-4.) After Pittman was hired, she submitted a "Patient Satisfaction Action Plan for 2N Medical Oncology" to the Hospital's Chief Nursing Officer and Chief Operating Officer. The Action Plan analyzed patient care in the unit. It stated:

> The staff members that do not have positive attitudes have not been held accountable. Issues have not been addressed. I hear 'she has been here for years, that's just the way she is.' Bad behavior is tolerated. There is no documentation in their employee files. It only takes one bad person/one bad experience to make the patient dissatisfied.

(Def.'s SOF Ex. D-2 (Patient Satisfaction Action Plan), ECF No. 24-6.) The Action Plan also included Pittman's recommendations for improving patient care and satisfaction, including making staff "aware of expectations, regional policies and management" and "aware they will be held accountable," discussing "patient comments-positive and negative," and starting "disciplinary process with problematic staff," including a "[p]lan to weed out some staff if behaviors do not improve" and "[a] zero tolerance policy for rude or negative attitudes." (*Id.*)

On April 7, 2011, Pittman held a staff meeting to introduce herself, explain how she would manage the unit, and address the unit's goals. The meeting minutes indicate that Pittman intended to increase accountability among staff through utilization of the Hospital's corrective action process. Pittman also distributed a document to her staff regarding the need to raise patient satisfaction scores, stating that she would require "[p]ositive attitudes from everyone – with patient[s], families and coworkers." (Def.'s SOF Ex. D-4 (Pittman Presentation), ECF No. 24-6.)

5

Sheedy admits that it was important to increase patient satisfaction scores on the unit. She also admits that she had a problem with negativity throughout her employment at the Hospital.

The hospital received multiple complaints about Sheedy shortly after Pittman became her supervisor. On April 5, 2011, the Hospital received a SHARE card from a patient that stated that Sheedy needed "good and happy bedside manners" and "neglected to crack a smile to a sick patient." (Def.'s SOF Ex. D-8 (SHARE Card), ECF No. 24-7.) On April 6, 2011, Pittman issued a verbal counseling to Sheedy because she believed that Sheedy had violated the Hospital's standards of behavior. Sheedy admits that she was not issued the April 6, 2011, verbal counseling because of her age.

On April 4, 2011, the Hospital received a complaint from a patient stating that Sheedy was not attentive, had withheld pain medication, and was overheard by the patient stating to another nurse that she did not believe the patient was in pain. Prior to issuing any discipline, Pittman spoke with Sheedy, the patient, and a co-worker who had witnessed and confirmed the patient's complaint. She also reviewed the patient's medical records. When reviewing the medical records, Pittman learned that Sheedy had not administered the patient's pain medication for as many as six hours after it was due. On April 18, 2011, Pittman issued a Written Reminder to Sheedy for violating the Hospital's standards of behavior. Sheedy admits that the disciplinary document accurately reflected the statement overheard by the patient regarding the patient's pain. (Def.'s SOF Ex. A (Sheedy Dep.) 71:16-17, ECF No. 24-1.) She also admits that the April 18, 2011, discipline was not issued to her because of her age.

On April 18, 2011, Pittman made Sheedy aware of the Hospital's Employee Assistance Program, where she could seek confidential help for the problems that had led to the discipline.

(Pittman Dep. 79:5-19.) Sheedy sought counseling and attended five sessions between May and August 2011. The sessions focused on Sheedy's attitude, body language, sarcasm, and negativity in her interactions with patients, family members, and colleagues.

On April 26, 2011, the Hospital received another complaint from a patient about Sheedy. According to the patient, when she complained that she disliked an evening snack, Sheedy rudely responded that she should "just eat the cracker." (Def.'s SOF Ex. D-10 (Disciplinary Discussion Record April 27, 2011), ECF No. 24-8.) Sheedy admits that the patient complained about her attitude. Prior to issuing Sheedy discipline for the incident, Pittman spoke to the patient and her roommate to confirm their perception of the incident. On April 27, 2011, Pittman issued a second Written Reminder to Sheedy for violating the Hospital's standards of behavior. (*Id.*) Sheedy admits that the disciplinary document accurately reflects the events as alleged by the patient and that the discipline was not issued to her because of her age. When she was issued the April 27, 2011, Written Reminder, Sheedy signed an acknowledgement that the next step of the corrective action process would be termination. (*Id.*)

On June 29, 2011, the Hospital received a patient complaint that Sheedy had been rude and ignored the patient's requests for assistance. Sheedy acknowledges that the patient perceived her to be "argumentative and rude" and to have provided unsatisfactory care, although she disagrees that her care was deficient. (Sheedy Dep. 83:23-84:3.) Pittman investigated the complaint. The patient reported that she was nauseated and that Sheedy did not give her medication for the nausea. Pittman testified at deposition that Sheedy should have called a doctor to determine if medication was appropriate for the patient. (Pittman Dep. 77:1-3.) According to Pittman, Sheedy told her that the patient was "drug-seeking." (*Id.* at 77:20.)

After each incident of discipline, Pittman spoke with Sheedy about the hospital's customer service standards, the need to raise the unit's patient satisfaction, and the fact that rudeness would not be tolerated. Sheedy admits that prior to the June 29, 2011, complaint, she had received a final warning. She also admits that it was patients' perception of her care that led to their complaints.

Pittman stated in a declaration that she decided to terminate Sheedy because of the June 29, 2011, complaint and Sheedy's history of violations and complaints during Pittman's time as her supervisor. (Def.'s SOF Ex. D (Pittman Decl.) ¶ 17, ECF No. 24-6.) Sheedy was terminated on June 30, 2011.

It was Pittman's normal practice to discuss her termination decisions with her supervisor, Wagner, and with Human Resources. Pittman had the final authority to hire or fire the employees who reported to her, however. Pittman stated in a declaration that the decision to terminate Sheedy was solely her own. (*Id.* at ¶ 25.) The termination was reviewed by Wagner and upheld.

Sheedy claims that Pittman stated, "Things have changed in nursing over the years," during an April or May 2011 staff meeting. (Sheedy Dep. 57:19.) She admits, however, that the statement was made in reference to the placement of computers in patient rooms. Sheedy contends that another nurse at the Hospital, Sylvia Barda, heard Wagner state during an April 2011 meeting that the Hospital's plan was to replace older nurses with younger nurses.[2] (Pl.'s SOF Ex. 2 (Barda Aff.) ¶ 7, ECF No. 33-2.) Wagner denies making such a statement. (Def.'s

---

[2] The Hospital contends that these alleged statements are inadmissible hearsay. The court considers them as evidence for purposes of this motion because they were made within the scope of the speakers' employment with Independence Plus and appear to be admissible as party opponent admissions pursuant to Federal Rule of Evidence 801(d)(2)(D). *See Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 761-63 (7th Cir. 2003).

Reply to Pl.'s SOF Ex. A (Wagner Decl.) ¶ 3, ECF No. 33-1.) Pittman states in a declaration that she was never told by Wagner that the Hospital had any plans to terminate older nurses or force them to retire. (Pittman Decl. ¶ 22.) Sheedy admits that she is not aware of any other comments allegedly made by Pittman or anyone else at the Hospital that concerned her age. She also admits that she can identify no younger employees who were treated more favorably than she was. No other employees under Pittman's supervision received four to five incidents of discipline for patient complaints over the course of several months.

**C. Sheedy's Claims**

Prior to her termination, Sheedy did not complain that she was being discriminated against because of her age.[3] She submitted a grievance challenging her discharge on July 17, 2011, and submitted an addendum to the grievance on July 22, 2011. The grievance did not indicate that she believed she had been discharged because of her age.

Sheedy filed a Charge of Discrimination with the EEOC on February 9, 2012. She then filed this action on May 22, 2012, to seek redress of violations under the ADEA, alleging that the Hospital violated the ADEA when it discharged her.

### III. ANALYSIS

Sheedy contends that she was terminated by the Hospital in violation of the ADEA, which makes it unlawful for an employer to "discharge any individual or otherwise discriminate against any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). To survive the Hospital's motion for summary judgment, Sheedy must demonstrate that a genuine issue of

---

[3] Sheedy states that she disagrees with this statement, but she does not provide a basis for the dispute or cite to evidence demonstrating a dispute, and the court therefore deems the fact admitted.

material fact exists as to whether the Hospital terminated her because of her age. This can be accomplished using either the "direct" or "indirect" method of proof.

Under the "direct method," a plaintiff must "point to enough evidence, whether direct or circumstantial, of discriminatory motivation to create a triable issue." *Egonmwan v. Cook Cnty. Sheriffs Dep't*, 602 F.3d 845, 849 (7th Cir. 2010). The focus of the direct method of proof is whether the evidence offered "points directly" to a discriminatory reason for the employer's action. *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009). Alternatively, under the burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the plaintiff must first establish a prima facie case of age discrimination by producing evidence that: (1) she is a member of the protected class (i.e., at least forty years old); (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated younger employees were treated more favorably. *Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 599-600 (7th Cir. 2010). If she establishes all four elements, the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 600. The burden then shifts back to the plaintiff to demonstrate that the reason offered is pretextual. *Id.*

Sheedy relies on the direct method, as she must, because she admits that she can identify no similarly situated younger employees who were treated more favorably than she was. Moreover, no other employee supervised by Pittman received as many disciplinary incidents as Sheedy over the span of a few months.

Sheedy must therefore identify sufficient direct or circumstantial evidence to create an issue of fact as to whether she was terminated for discriminatory reasons. Proving discrimination via direct evidence "essentially requires an admission by the decision-maker that

[her] actions were based on the prohibited animus." *Radue v. Kimberly–Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000). No such evidence exists in this case. Sheedy admits that she unaware of any comments allegedly made by Pittman, the person responsible for her termination, that concerned her age. Rather, Sheedy attempts to construct "a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decision-maker.'" *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)). In this circuit, courts typically identify three (non-exclusive) categories of circumstantial evidence on which a plaintiff may rely to make such a showing:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.

*Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 812 (7th Cir. 2007) (citation omitted).

Sheedy relies on the following pieces of circumstantial evidence in support of her age discrimination claim: (1) Barda's affidavit stating that Wagner said in a meeting that the Hospital's plan was to replace older nurses with younger nurses; (2) Sheedy's positive annual evaluation from 2010; (3) Sheedy's participation in counseling at the time of her termination; and (4) the timing of the disciplinary action.

This evidence, however, is insufficient to create a material issue of fact as to whether Sheedy was terminated because of her age. The court first addresses Wagner's alleged comment. The court assumes, as it must for the purposes of the motion for summary judgment, that Barda's affidavit is true. Wagner was Pittman's direct supervisor, and Pittman discussed Sheedy's

11

termination with Wagner. Wagner also reviewed the decision to terminate Sheedy and upheld it. Even so, it is uncontested that Pittman had the final authority to fire Sheedy, and there is no evidence creating an issue of material fact as to whether the decision to terminate Sheedy was made by anyone but Pittman. Furthermore, the comment was not made in Pittman's presence. Pittman stated in her declaration that she was never told by Wagner that the Hospital had any plans to terminate older nurses or force them to retire, and Sheedy can point to no evidence that such a communication occurred. Thus, even if Wagner stated that older nurses were going to be replaced, the comment does not support an inference of "intentional discrimination by the decision-maker," *Rhodes*, 359 F.3d at 504, because the decision maker was Pittman, not Wagner, and there is no evidence that Wagner manipulated Pittman into firing Sheedy.

Sheedy also points to her positive evaluation. But the evaluation was completed in February 2011 by Sheedy's previous supervisor and concerned Sheedy's performance during 2010. Pittman did not become Sheedy's supervisor until March 2011. It is undisputed that Pittman placed a priority on improved customer service and patient satisfaction in the unit. Thus, the positive 2010 evaluation has little bearing on Pittman's decision to terminate Sheedy.

Moreover, Sheedy does not dispute that during the short time she was supervised by Pittman, the Hospital received numerous complaints about her interactions with patients, nor does she dispute that the complaints were based on the patients' perceptions of her care. She admits that she received three disciplinary incidents in April 2011 and knew that additional complaints could lead to her termination. She was on a final warning when she received yet another patient complaint on June 29, 2011. It is undisputed that the complaints were unrelated to Sheedy's age. In sum, there is no evidence that would support an inference that the stated reason for Sheedy's termination—her deficiencies in performance—was a pretext for age

discrimination.  The fact that Sheedy received a positive evaluation in 2010 does not mean that she was meeting Pittman's expectations in 2011.  The evidence is strongly to the contrary.

Sheedy also argues that she was participating in counseling sessions at the time of her termination.  This evidence has little bearing on whether Pittman's decision to fire her was discriminatory.  Nothing in the record suggests that Sheedy was ever promised that she could keep her job if she underwent counseling.

Finally, Sheedy argues that the timing of the disciplinary action provides additional circumstantial evidence of discrimination.  The timing of the termination on June 30, 2011, however, suggests that it was directly related to the four patient complaints about Sheedy received in April and June 2011.  Indeed, Sheedy was terminated the day after the final patient complaint, received after she was informed that she was on a final warning.  Thus, the timing of the disciplinary action does not support an inference of discrimination.

Sheedy makes no other arguments to support her claim under the direct method of proof.  The court concludes that she has failed to present evidence sufficient to create a genuine dispute of fact regarding whether she was unfairly terminated by the Hospital.

## IV. CONCLUSION

For the reasons explained above, defendant Adventist Hinsdale Hospital's motion for summary judgment is granted.  Judgment is entered in favor of the Hospital on Sheedy's ADEA claim.  All pending claims having been resolved, the clerk is directed to terminate this case.

ENTER:

    /s/
JOAN B. GOTTSCHALL
United States District Judge

DATED:  January 22, 2014